IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 1, 2021



**IN RE IMA D. ET AL.**

**Appeal from the Juvenile Court for Hickman County**
**No. 20-JV-143      Amy Cook Puckett, Judge**
_____

**No. M2021-00022-COA-R3-PT**
_____

In this case involving termination of the father's parental rights to his children, the Hickman County Juvenile Court ("trial court") determined that several statutory grounds for termination had been proven by clear and convincing evidence. The trial court further determined that clear and convincing evidence demonstrated that termination of the father's parental rights was in the children's best interest. The father has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and KENNY W. ARMSTRONG, JJ., joined.

Matthew R. Muenzen, Franklin, Tennessee, for the appellant, Mark D.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.  Factual and Procedural Background

On July 1, 2020, the Tennessee Department of Children's Services ("DCS") filed a petition in the trial court, seeking to terminate the parental rights of Hannah K. ("Mother") and Mark D. ("Father") to their minor children, Ima D. and Jacob D. ("the Children"), who were approximately eighteen months old and three years old, respectively, at the time of the petition's filing.[1]  In the petition, DCS stated that although Mother and Father were not

_____

[1] Mother has not appealed the trial court's termination of her parental rights to the Children.  We will

married at the time of Jacob's birth, they were married at the time of Ima's birth. It is undisputed that Mother and Father resided together with the Children until Father was incarcerated in March 2019.

DCS averred that the Children had been in state custody since April 30, 2019, based upon a finding of dependency and neglect by the trial court. The Children were removed from the custody of Mother and Father upon a dependency and neglect petition filed by their paternal grandmother on April 12, 2019, alleging that Father was incarcerated and that Mother's whereabouts were unknown. Shortly thereafter, the Children were removed from the custody of their paternal grandmother and placed in the custody of DCS upon a dependency and neglect petition filed on April 30, 2019, alleging that Ima had tested positive for methamphetamines while in the grandmother's care.

In its termination petition, DCS asserted that Father had abandoned the Children by failing to visit them, failing to support them, and failing to provide them with a suitable home. DCS also asserted that Father had failed to comply with his permanency plan and that the conditions leading to the Children's removal from their parents' home persisted. In addition, DCS petitioned the trial court to determine that Father had failed to manifest an ability and willingness to assume legal and physical custody of the Children and that Father was guilty of severe child abuse. DCS averred that termination of Father's parental rights was in the Children's best interest.

The trial court appointed a guardian *ad litem* for the Children by order entered on July 28, 2020. The trial court concomitantly entered an order appointing counsel for Father predicated upon his affidavit of indigency.

The trial court conducted a bench trial in this matter on November 5 and 6, 2020. At the beginning of the trial, DCS's counsel announced that the ground of severe child abuse would not be pursued. The trial court then heard testimony from Erik Henson and Emily James, employees of DCS; Sarah L., foster mother of the Children ("Foster Mother"); Father; and Steven Carroll, Child Support Services administrator.

Following the hearing, the trial court entered an order on December 14, 2020, terminating Father's parental rights to the Children based upon the statutory grounds, proven by clear and convincing evidence, of abandonment by failure to pay child support, abandonment by failure to provide a suitable home, substantial noncompliance with his permanency plans, persistence of the conditions leading to the Children's removal, and Father's failure to manifest a willingness and ability to assume legal and physical custody or financial responsibility of the Children. The trial court also determined, by clear and convincing evidence, that termination of Father's parental rights was in the Children's best interest. The trial court further determined that DCS had failed to prove the statutory

therefore confine our analysis to those facts relevant to Father's appeal.

ground of abandonment by failure to visit by clear and convincing evidence. In its order, the trial court made extensive factual findings concerning the statutory grounds and best interest factors. Father timely appealed.

## II. Issues Presented

Father has raised the following issues for our review, which we have restated slightly:

1.      Whether the trial court erred by finding clear and convincing evidence supporting the statutory ground for termination of Father's parental rights of abandonment by failure to support.

2.      Whether the trial court erred by finding clear and convincing evidence supporting the statutory ground for termination of Father's parental rights of abandonment by failure to provide a suitable home.

3.      Whether the trial court erred by finding clear and convincing evidence supporting the statutory ground for termination of Father's parental rights of substantial noncompliance with the permanency plans.

4.      Whether the trial court erred by finding clear and convincing evidence supporting the statutory ground for termination of Father's parental rights of persistence of the conditions leading to removal of the Children.

5.      Whether the trial court erred by finding clear and convincing evidence supporting the statutory ground for termination of Father's parental rights of failure to manifest a willingness and ability to assume legal and physical custody or financial responsibility of the Children.

6.      Whether the trial court erred by finding clear and convincing evidence that it was in the Children's best interest to terminate Father's parental rights.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn.

2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

> \* \* \*

- 4 -

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

## IV. Grounds for Termination of Father's Parental Rights

Tennessee Code Annotated § 36-1-113 (2021) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)     The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

\* \* \*

(c)     Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported a finding of five statutory grounds to terminate Father's parental rights. We will address each statutory ground in turn.

A. Statutory Abandonment

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (2021) provides, as relevant to this action:

(g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Tennessee Code Annotated § 36-1-102(1)(A) (2021) provides the following definitions of abandonment as pertinent here:

(i)     For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

(ii)    (a)     The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(b)     The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(c)     For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a

suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . . .

### 1. Failure to Support the Children

Father contends that the trial court erred in finding by clear and convincing evidence that he had abandoned the Children by failing to support them during the four months preceding the termination petition's filing. Although the trial court determined that this statutory ground had been proven by clear and convincing evidence, the court made no finding concerning the specific dates when the four-month determinative period began and ended. We find that the beginning point of this time period should be March 1, 2020, and the ending point should be June 30, 2020, the day before the termination petition was filed ("Determinative Period"). *See In re Joseph F.*, 492 S.W.3d 690, 702 (Tenn. Ct. App. 2016)(explaining that the applicable four-month statutory period preceding filing of the termination petition "began on March 8, 2011, and concluded on July 7, 2011, the day prior to the filing of the termination petition") (citing *In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014)). Because we determine that the trial court's findings regarding this statutory ground are inclusive of the Determinative Period such that we may proceed with our analysis, we further determine the trial court's omission of specific dates for the Determinative Period to be harmless error under the circumstances of this case. *See, e.g.*, *In re Steven W.*, No. M2018-00154-COA-R3-PT, 2018 WL 6264107, at *12 (Tenn. Ct. App. Nov. 28, 2018) ("[T]he trial court's determination of the entire time the Children were in protective custody as the relevant time period could be considered harmless error if proof of abandonment through the parent's willful failure to visit or support were clear and convincing for the entire time period, 'encompass[ing] the correct determinative period.'" (quoting *In re Savanna C.*, No. E2016-01703-COA-R3-PT, 2017 WL 3833710, at *9 (Tenn. Ct. App. Apr. 18, 2017)).

In its final order, the trial court specifically found that although Father had been ordered to pay child support on February 11, 2020, he had voluntarily paid only two five-dollar payments in April 2020 during the Determinative Period. The trial court found that although Father's stimulus payments had been intercepted by child support services, Father had done nothing to facilitate or allow such interception of funds to take place. The court

also found that Father had not provided any in-kind support such as clothes, diapers, or school supplies.

The trial court further noted that Father had tested positive for methamphetamines in March 2020 while he was living with Mother. Regarding this incident, the trial court stated: "Certainly, money that was presumably used to purchase meth could be used to support the children." The court acknowledged that Father had testified that his employment was "off and on because of his having to comply with sex offender registry work restrictions" and that he was also paying fees, fines, and court costs to avoid probation violations. Notwithstanding, the court concluded that although Father had the means to pay child support, he had chosen not to do so.

On appeal, Father contends that his child support obligation during the Determinative Period had been satisfied inasmuch as his federal stimulus payments had been intercepted and applied to his child support obligation in June 2020. We note, however, that such intercepted payments are typically not considered when determining whether a parent has failed to support his children. *See In re Dustin T*., No. E2016-00527-COA-R3-PT, 2016 WL 6803226, at \*13 (Tenn. Ct. App. Nov. 17, 2016) (explaining that an intercepted tax refund did not constitute a voluntary payment of child support); *In re Kadean T*., No. M2013-02684-COA-R3-PT, 2014 WL 5511984, at \*7 (Tenn. Ct. App. Oct. 31, 2014) ("[T]he trial court correctly concluded that the tax intercept would not be considered in determining whether Mother failed to support her child during the relevant period."); *In re Alyssa Y.*, No. E2012-02274-COA-R3-PT, 2013 WL 3103592, at \*10 (Tenn. Ct. App. June 17, 2013) (explaining that interception of a parent's tax refund was not relevant to determining whether that parent failed to support her child). *See also In re Elijah R*., No. E2020-01520-COA-R3-PT, 2021 WL 2530644, at \*18 (Tenn. Ct. App. June 21, 2021) (determining that monies intercepted "from tax refunds or stimulus payments from the federal government" would not be considered voluntary child support payments when analyzing the statutory best interest factors). Accordingly, the only voluntary child support payments made by Father during the Determinative Period were two five-dollar payments made in April 2020.

Tennessee Code Annotated § 36-1-102(1)(D) (2021) provides the following definition concerning a parent's failure to support:

> For purposes of this subdivision (1), "failed to support" or "failed to make reasonable payments toward such child's support" means the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period[.]

- 8 -

Support is considered "token" when "the support, under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B) (2021). The statute further provides:

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102(1)(I) (2021).

In the case at bar, as DCS points out, Father did not raise lack of willfulness as an affirmative defense in his answer because he failed to file an answer. Moreover, we emphasize that under the applicable version of the statute, the burden of proof for this affirmative defense is upon Father. *See* Tenn. Code Ann. § 36-1-102(1)(I); *In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *13 (Tenn. Ct. App. July 15, 2019) ("Under Tenn. Code Ann. § 36-1-102(1)[(I)], willfulness is an affirmative defense; thus, the burden is upon [the parent] to establish that his failure to [visit or support] was not willful."). As this Court has previously explained:

> Willfulness in the context of termination proceedings does not require the same standard of culpability as is required by the penal code, nor does it require that the parent acted with malice or ill will. Rather, a parent's conduct must have been willful in the sense that it consisted of intentional or voluntary acts, or failures to act, rather than accidental or inadvertent acts.

*In re Alysia S.*, 460 S.W.3d 536, 565-66 (Tenn. Ct. App. 2014) (internal citations omitted).

Nonetheless, Father appears to argue that his failure to support the Children was not willful and/or that the support paid was not token because he did not possess the means to provide additional support during the Determinative Period. We disagree. The proof demonstrated that Father was employed intermittently during the Determinative Period, at times digging graves at the pay rate of one hundred dollars per day and at other times refurbishing pallets at the pay rate of approximately sixty to seventy dollars per week. Father further admitted that he was residing in his mother's home during the Determinative Period and that his mother was helping him financially.

During trial, Father claimed that if he had paid more child support, he would have "starved." Moreover, according to Father, although he was physically able to work, he had difficulty maintaining employment due to his status as a registered sex offender. Father

acknowledged that although he had earned one hundred dollars per day for approximately one and one-half weeks in March 2020, he had tendered no child support because he had to pay probation fines and other bills. As this Court has previously explained, however: "Spending money on other bills or obligations does not absolve the failure to pay court-ordered child support. In fact, having the means to meet other financial obligations evidences an ability to pay child support." *In re Dustin T.*, 2016 WL 6803226, at *14 (*quoting Buttrey v. Buttrey*, No. M2007-00772-COA-R3-CV, 2008 WL 45525, at *2 (Tenn. Ct. App. Jan. 2, 2008)). Father similarly conceded that although he had earned some amount of income in May from pallet refurbishing and in June from providing grave services, he had made no voluntary child support payments in either of those months. Inexplicably, however, Father paid ten dollars in child support in April, a month during which he claimed to have had no income. Father admitted that these payments were made with his mother's debit card.

Based on the proof presented at trial, we determine that Father's two five-dollar support payments made during the Determinative Period were "insignificant given [Father's] means" and thus constituted token support. *See* Tenn. Code Ann. § 36-1-102(1)(B). We further determine that even if Father had properly pled the affirmative defense of lack of willfulness, he failed to carry his burden of proof in that regard. We therefore affirm the trial court's determination that DCS proved the statutory ground of abandonment by failure to support by clear and convincing evidence.

2. Failure to Provide a Suitable Home

Father contends that the trial court erred in finding by clear and convincing evidence that he had abandoned the Children by failing to provide a suitable home. With respect to this abandonment ground, the trial court specifically found that the Children had been removed from the home of Mother and Father in April 2019 and that "[w]hen the children were removed from the custody of their parents, there were concerns that both parents had been using methamphetamine, that [Father] was incarcerated, and that [Mother] needed residential stability, as her whereabouts were unknown." The court found that following the Children's removal from Father's home, DCS made "reasonable efforts to assist the parents to establish a suitable home for the children by providing or referring the following for the parents: mental health assessment, A & D [alcohol and drug] assessment, A & D treatment, therapeutic visitation" and that the "efforts of DCS to assist the parents in establishing a suitable home for the children equaled or exceeded the parents' efforts toward the same goal." The court determined that Father had demonstrated a lack of concern for the Children by being arrested on new criminal charges in August 2020, resulting in his incarceration at the time of trial. Upon our thorough review of the proof, we conclude that the evidence presented at trial supports these findings.

The proof was undisputed that the Children were removed from Father's home in April 2019 and thus had been in protective custody for some eighteen months by the time

of trial. Erik Henson, the DCS family services worker assigned to this matter, testified concerning the efforts DCS had made toward reunification following the Children's removal, including scheduling an alcohol and drug assessment for Father, scheduling a mental health assessment for Father, attempting to assist Father in finding new housing, facilitating visitation with the Children, and providing random drug screens. The trial court specifically found that DCS's efforts to assist Father were reasonable, and we agree with that determination.

Father contends that due to his initial incarceration, the efforts DCS made to assist him were not accomplished within the first four months following removal and thus cannot satisfy the requirements of the statute. We disagree. This Court has previously clarified that DCS can satisfy this requirement "if it establishes that reasonable efforts were made during any four-month period following a child's removal." *In re Roderick R.*, No. E2017-01504-COA-R3-PT, 2018 WL 1748000, at *11 n.13 (Tenn. Ct. App. Apr. 11, 2018); *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Sep. 20, 2016).

The proof further preponderates in favor of the trial court's finding that Father failed to make reciprocal reasonable efforts to provide a suitable home for the Children, despite DCS's efforts to assist Father. During the time Father was not incarcerated, spanning from mid-December 2019 to mid-August 2020, Father worked intermittently; lived in his mother's home, where one child had been exposed to methamphetamines; and cohabitated with Mother, whom Father admitted was using heroin. Although Father completed an alcohol and drug assessment arranged by DCS, he also failed a random drug screen in March 2020 and failed to submit to a hair follicle drug screen after disputing the results of the prior screen. Notably, Mr. Henson testified that Father would have been allowed in-person, supervised visitation with the Children in March and April of 2020 had he passed a random drug screen.[2] Also, rather than resolving his prior criminal charges, Father was instead reincarcerated on new criminal charges in August 2020. In short, during the eighteen months the Children had been in protective custody, Father failed to improve his situation in any manner.

We further agree that Father has demonstrated a lack of concern for the Children to such a degree that it appears unlikely that he will be able to provide a suitable home for the Children at an early date. Although Father claimed that he was innocent of the recent criminal conspiracy charges and testified that he had a court date in the near future concerning those charges, he did not know how long it would be before he might be released from incarceration. Father acknowledged that his only option upon his eventual

---

[2] The trial court's February 6, 2020 order specified that Father would not be allowed to visit with the Children unless he passed a drug screen. Although Mr. Henson acknowledged that Father did pass a <u>scheduled</u> drug screen that was requested by Father, Mr. Henson clarified that Father had failed the subsequent drug screen that was randomly administered.

release would be to resume residing with his mother in a home that DCS had found to be inappropriate because Ima was exposed to methamphetamines while living there.

In addition, Foster Mother testified that Ima suffered from significant health issues such that she had undergone four surgeries in recent months and had required three hospitalizations. Father acknowledged at trial that he was unable to provide a home for the Children at that time by reason of his incarceration and that he would struggle to do so upon his release. In a prior case involving a child with medical needs, this Court explained:

> [A] suitable home requires more than a physical space. [The subject child] is a child with permanent injuries who requires constant care. For him, a suitable home requires the presence of a care giver who can supply the care and attention he needs. By her own admission, Mother is not currently that person. We recognize that Mother is not seeking custody of [the child] at this time. We also recognize, however, that it is unlikely that [the child] can return to his Mother's home at any time in the near future.

*In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002).

Similarly, here, Father could not have the Children in his custody at the time of trial, and his circumstances indicated that he would not be able to provide a suitable home for the Children in the near future. Based upon the proof presented, we determine that the evidence preponderates in favor of the trial court's finding, by clear and convincing evidence, existence of the statutory ground of abandonment by failure to provide a suitable home.

### B. Substantial Noncompliance with Permanency Plans

The trial court also found by clear and convincing evidence that Father had failed to substantially comply with the statement of responsibilities set forth in the permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) (2021) provides as an additional ground for termination of parental rights:

> (2)    There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

Concerning this statutory ground, the trial court stated in pertinent part:

> Mother's instability and [F]ather's criminal activity were crucial factors in the children's removal. . . .

Father blamed his having to comply with the sex offender registry as causing the majority of his problems with housing and working. [Father] testified that he has worked for a grave digging company and refurbishes pallets for spare money. He testified that he chose to pay court fines and costs and probation fees rather than child support.

Failed drug screens by both parents prevented in-person visitation. [Father and Mother] have not substantially complied with the responsibilities of the permanency plans. . . .

Even if [F]ather were to be released from incarceration soon, he would still need to acquire housing, and he would need additional time to comply with the permanency plans. Father still needs to demonstrate stable housing, employment and sobriety. He needs to complete a mental health intake and follow any recommendations. Furthermore, he would need to begin in-person visitation with the children. Additionally, [Father] needs to resolve pending criminal charges in Hickman County. . . .

[Father and Mother] knew the consequences of their failure to substantially comply with the permanency plan because they received an explanation of the Criteria and Procedures for Termination of Parental Rights in August of 2019. They both were present and represented by counsel on September 24, 2019, when the Juvenile Court ratified the permanency plan developed on September 4, 2019.

[Father] presently does not have a legal source of income due to incarceration, has not provided any type of gifts or financial contribution for the care of the children except $10 and involuntary stimulus interceptions since the children were removed from their custody in April of 2019.

Upon thorough review of the record, we determine that the evidence preponderates in favor of the trial court's findings.

To terminate parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(2), the parent's noncompliance with the permanency plan must be substantial. *See In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). Additionally, our Supreme Court has held that "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id.* This Court has explained the following regarding the ground of substantial noncompliance with the permanency plan:

Mere noncompliance is not enough to terminate a parent's rights. *In re Valentine*, 79 S.W.3d [643,] 548 [(Tenn. Ct. App. 2004)]. Additionally,

- 13 -

the unsatisfied requirement(s) must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d [643,] 656 [(Tenn. Ct. App. 2004)] (citing *In re Valentine*, 79 S.W.3d at 548). Improvements in compliance are construed in favor of the parent. *In re Valentine*, 79 S.W.3d at 549 (citing *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)). Yet, we must determine compliance in light of the permanency plan's important goals:

> In our view, a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives. We think that where return to parent is the goal, parents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring for their children in the long-term, not on a month-to-month basis.

*In re V.L.J.,* No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014).

*In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at *20-21 (Tenn. Ct. App. Oct. 21, 2015).

In the instant action, Mr. Henson testified that a permanency plan was developed for Father on September 4, 2019, which was subsequently ratified by the trial court on September 24, 2019. Father's responsibilities pursuant to this plan included: being released from jail and complying with the rules of his probation; not incurring additional criminal charges; submitting to a mental health assessment and an alcohol and drug assessment; submitting to random drug screens; participating in supervised, therapeutic visitation; establishing a legal source of income and stable housing; and obtaining a driver's license or valid transportation plan.

A second permanency plan was ratified by the trial court on April 14, 2020. Father's responsibilities pursuant to this plan were largely the same, including: paying child support as ordered by the court; submitting to random drug screens; complying with the rules of his probation; not incurring additional criminal charges; submitting to a mental health assessment and an alcohol and drug assessment; participating in supervised, therapeutic visitation; establishing a legal source of income and stable housing; and obtaining a driver's license or valid transportation plan. We determine, as did the trial court, that all of these responsibilities were reasonably related to the goal of reunification.

- 14 -

Relevant to these requirements, Father was released from jail in December 2019 and subsequently submitted to an alcohol and drug assessment. Mr. Henson testified that Father complied with no other action steps of his plans. Father failed to pay child support as ordered, failed a randomly administered drug screen, and failed to establish stable income or housing. Father never submitted to a mental health assessment and never obtained his driver's license. In addition, Father was reincarcerated in August 2020 following his arrest for new criminal conspiracy charges.

Based on the evidence presented, we conclude that Father failed to substantially comply with the goals and responsibilities of the permanency plans. Father did not "complete [his] responsibilities in a manner that demonstrate[d] that [he was] willing and able to resume caring for [the Children] in the long-term." *See in re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014). We therefore determine that clear and convincing evidence supported this statutory ground for termination as well.

### C. Persistence of Conditions Leading to Removal

The trial court also found clear and convincing evidence of the statutory ground of persistence of the conditions leading to removal of the Children from Father's home or physical and legal custody. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) (2021) provides:

(A)    The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

    (i)    The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

    (ii)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

    (iii)    The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B)   The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

In the case at bar, the Children were removed from Father's home in April 2019 following the filing of a dependency and neglect petition. We reiterate that Father's criminal activity, resulting in his incarceration, was a substantial factor leading to removal. At the time of trial, which was approximately eighteen months following the Children's removal, Father was once again incarcerated due to additional criminal charges that he incurred while the Children were in protective custody. Because of Father's incarceration, the Children could not be returned to his care.

In addition, Father testified that he did not know when he would be released from incarceration. Father conceded that even if he were released immediately, he would have no choice but to return to his mother's home, where Ima had been exposed to methamphetamines. Father also admitted at trial that he was currently unable to care for the Children or support them. Moreover, as the trial court noted in its final order, Father had failed to "use[] the opportunity between incarcerations to secure stable housing, despite having the resources of DCS at his disposal."

The trial court further found:

While [Father's] incarceration led to the children's removal, the children's prolonged stay in foster care is the result of decisions made by [F]ather to resume criminal activity after his release from jail. There is little likelihood that these conditions will be remedied at an early date so that these children can be returned to their father's care soon. When Father acquires housing, he would need considerable time to demonstrate sobriety and stability.

Based on the length of time that the Children had been in DCS custody, the evidence supports the trial court's determination that there was little likelihood that the conditions leading to removal would be remedied at an early date so that the Children could be returned safely to Father. Furthermore, it is clear that continuation of the parent-child relationship would inhibit the Children's ability to integrate into a stable home. We therefore determine that clear and convincing evidence also established this statutory ground for termination.

D.  Failure to Manifest an Ability and Willingness to Assume Legal and Physical Custody of or Financial Responsibility for the Child

Father also argues that the trial court erred by finding that DCS had proven by clear and convincing evidence that he had failed to manifest an ability and willingness to assume

- 16 -

legal and physical custody of or financial responsibility for the Child. Concerning this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) (2021) provides:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, DCS was required to show by clear and convincing evidence that (1) Father failed to manifest either an ability or willingness to assume custody or financial responsibility of the Child and (2) returning the Child to Father's custody would pose a risk of substantial harm to the Child's welfare. *In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

The trial court found as follows with respect to this statutory ground:

> As of the date of the filing of the TPR [termination of parental rights] petition and the TPR hearing, [Mother] and [Father] had not manifested an ability and willingness to assume legal and physical custody of their children. They had not progressed to in-person visitation despite having known what steps they needed to take to begin in-person visitation.

> Mother did not appear in court to express her desire to personally assume responsibility of the children. Father has been re-arrested and incarcerated multiple times while the children have been in foster care. He has been in jail continuously since August of 2020. At that time, the children had been in foster care for approximately sixteen months.

> Neither parent has filed a pleading with the Juvenile Court asking for the children to be returned to their custody. It is unsafe to return the children to [Mother's] care until she has demonstrated stability and sobriety and willingness to support her children. Father's incarceration and on-going criminal activity reveals neither a willingness nor an ability to assume legal and physical custody of or financial responsibility of them. Even if [F]ather's criminal charges were to be resolved soon, [Father] would need to establish sober and stable living for a meaningful period. He would need to pass drug screens upon request by DCS. [Father] and [Mother] would need to bond with their children.

- 17 -

Father asserts that the trial court erred by determining that he had failed to manifest a willingness to assume custody of the Children. Father expressed his love for the Children at trial and stated that he desired to have custody returned to him if he were able to be released from incarceration while also acknowledging that this was a somewhat selfish desire on his part because the Children were doing well with their foster parents. We note, however, that a parent's actions can demonstrate a lack of willingness to assume custody of or financial responsibility for the child. *See In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018) (finding that a parent had failed to manifest a willingness to assume custody because, *inter alia*, she "was incarcerated and had completed virtually none of her plan responsibilities" by the time of trial); *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *15 (Tenn. Ct. App. June 20, 2018) ("Father's actions, including his continued criminal activity and his failure to financially support the Child, raise doubt as to Father's actual willingness to assume custody or financial responsibility for the Child.").

Even assuming, *arguendo*, that Father has demonstrated the <u>willingness</u> to assume legal and physical custody of the Children, the evidence preponderates in favor of a determination that Father has failed to manifest the <u>ability</u> to assume legal and physical custody. Our Supreme Court has recently noted the "nearly identical" language between a statutory ground applicable to putative fathers and the first prong of the statutory ground provided in Tennessee Code Annotated § 36-1-113(g)(14). *See In re Neveah M.*, 614 S.W.3d at 677. In holding that § 36-1-113(g)(14) "places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child," the High Court cited with approval its earlier discussion in *In re Bernard T.* of the same statutory language in § 36-1-113(g)(9)(A)(iv):

> Although our discussion of this language was not dispositive of the <u>In re Bernard T.</u> appeal, this Court affirmed termination of parental rights where the father had "manifested a commendable willingness to assume legal custody of all the children" but "conceded that he was unable to support the children financially and that he could not provide them with a stable residence." 319 S.W.3d at 604. We concluded that the father's "testimony alone provide[d] clear and convincing evidence that [the father] [did] not presently have the ability to assume legal and physical custody of any of the children." *Id.* at 604-05.

*In re Neveah M.*, 614 S.W.3d at 677. Therefore, in order to establish this ground for termination of Father's parental rights to the Children, DCS was required to prove that Father had failed to manifest either the willingness or the ability to assume legal and

physical custody of the Children. *See id.*[3] Due to his continuing criminal activity and resultant incarceration, as well as his lack of progress concerning stable income, housing, sobriety, and other requirements before he could regain custody, Father clearly lacked the ability to assume legal and physical custody of the Children.

As part of this statutory ground, DCS was also required to prove that returning the Children to Father's custody would pose a risk of substantial harm to the Children's welfare. *In re Neveah M.*, 614 S.W.3d at 674, 677. This Court has previously observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

In this case, the trial court found as follows concerning the issue of substantial harm:

> [Foster Mother] has provided a safe, stable home for the children for a year and half. [Ima] was approximately three months old when she first went to live in the home of [Foster Mother]. Mr. Henson testified that she and Jacob are thriving in [Foster Mother's] home. Removing them from this home would have a harmful effect on them.

The evidence does not preponderate against these findings of fact. This Court has previously determined that removing a child who has "bonded and thrived" with his current family and placing a child in the custody of a near-stranger would amount to substantial harm. *See In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *17 (Tenn. Ct. App. July 22, 2020) (determining that the child would be at risk of substantial psychological harm if custody were restored to the father who had been apart from the child for five years and was a "virtual stranger"); *In re Antonio J.*, No. M2019-00255-

---

[3] Father asserts that because *In re Neveah M.* was not decided by our Supreme Court until December 2020, which was subsequent to the November 2020 trial herein, it cannot be applied in this case. We find Father's argument in this regard to be unavailing. In the *Neveah* opinion, our High Court was interpreting the language of a statutory ground that had been enacted by our legislature in 2016. In addition, the Supreme Court in *Neveah* affirmed an earlier decision of this Court, *In re Amynn K.*, 2018 WL 3058280, at *14, which had interpreted this statutory ground in the same manner.

COA-R3-PT, 2019 WL 6312951, at *9 (Tenn. Ct. App. Nov. 25, 2019) (concluding that placing the children in the mother's custody would put them at risk of substantial harm because the children were "very young" when they were removed and had "little to no contact" with the mother for more than a year).

In the case at bar, removing the Children from their foster parents, who have cared for them since Ima was three months of age and Jacob was less than two years old, and placing them in Father's custody would undoubtedly pose a risk of substantial harm to the Children. Father is a virtual stranger to the Children and has been incarcerated for a substantial portion of their lives. By the time of trial, Father had not seen the Children in person for more than eighteen months. Foster Mother testified that the Children did not mention Father and did not appear to understand who Father was.

Furthermore, the evidence presented at trial overwhelmingly supports the trial court's conclusion that the Children had bonded and thrived with their foster parents. Foster Mother testified that the Children referred to her and her husband as "Mom" and "Dad" and that they had also bonded with their foster siblings. Foster Mother stated that she believed removing the Children from their home would be traumatic for the Children because it was the only home the Children had ever known or could remember. We agree with the trial court's determination that removing the Children from their foster parents' home would present a risk of substantial harm to the Children's welfare.

Upon careful review, we conclude that clear and convincing evidence supported the trial court's finding that Father had failed to manifest an ability to assume legal and physical custody of or financial responsibility for the Children and that placing the Children in Father's custody would put the Children's welfare at risk of substantial harm. Ergo, this statutory ground for termination of Father's parental rights has been established, and the trial court's conclusion is affirmed.

## V. Best Interest of the Children

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case.").

- 20 -

Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

The version of Tennessee Code Annotated § 36-1-113(i) (Supp. 2020) in effect when the petition was filed in the instant action listed the following factors for consideration:[4]

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

---

[4] Effective April 22, 2021, the General Assembly has amended Tennessee Code Annotated § 36-1-113(i) by deleting the previous subsection in its entirety and substituting a new subsection providing, *inter alia*, twenty factors to be considered in determining a child's best interest in a case involving termination of parental rights. *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). However, because the termination petition in this case was filed prior to the effective date of the amendment, the statutory best interest factors provided in the prior version of the statute are applicable here. *See, e.g.*, *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court has explained regarding the best interest analysis:

> "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d [240,] 254 [(Tenn. 2010)].
>
> When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).
>
> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each

statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

In re Gabriella D., 531 S.W.3d 662, 681-82 (Tenn. 2017).

In the instant action, the trial court concluded that the statutory factors weighed against maintaining Father's parental rights to the Child. In its final order, the trial court made extensive factual findings, too lengthy to recount here, concerning each of the above statutory factors. Following our thorough review of the evidence in this matter, we conclude that the trial court's factual findings are supported by a preponderance of the evidence.

The evidence presented demonstrates that Father has not "made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child[ren]'s best interest" to be in his home. See Tenn. Code Ann. § 36-1-113(i)(1). Father was incarcerated at the time of trial on new criminal charges and had failed to complete most of the action steps of his permanency plans, including the requirements that he establish safe and permanent housing, maintain a legal source of income, demonstrate sobriety, and pay child support as ordered.

Furthermore, Father did not avail himself of opportunities to improve his situation during the time that he was not incarcerated. Despite reasonable efforts by DCS to assist Father with housing, a mental health assessment, random drug screens, and other efforts, Father failed to make progress toward visitation with the Children during the eight months that he was free from incarceration. Instead, Father incurred new criminal charges and was reincarcerated, such that after having lost custody of his Children for a period of eighteen months, Father was in no better position to resume custody at the time of trial than he had been at the time of the Children's removal.

Concerning his contact with the Children, Father had participated in short video calls with the Children in the months leading up to trial. However, the proof did not

establish that Father had a meaningful relationship with the Children. Foster Mother stated that the Children never mentioned Father and never referred to him as "Dad." The evidence did demonstrate, however, that the Children were bonded to their foster parents and were thriving in their care. Foster parents were meeting all of the Children's physical, emotional, and medical needs. As such, the proof demonstrated that a change of caretakers and physical environment was likely to have a detrimental effect on the Children's emotional, psychological, and medical conditions.

Although no evidence was presented that Father had ever shown brutality or abuse toward anyone in his home, there was evidence demonstrating that the home where Father resided when he was not incarcerated was not healthy or safe due to criminal activity in the home and the presence of controlled substances or controlled substance analogues. Ima was exposed to methamphetamines at three months old while residing in the paternal grandmother's home, which was the home Father intended to return to after his release.

Inasmuch as Father had never completed a mental health assessment, no evidence was presented concerning his mental state. Evidence was presented, however, that Father had failed to pay child support as ordered.

Accordingly, based on the proof presented at trial concerning the best interest factors, we conclude that the trial court properly determined, by clear and convincing evidence, that termination of Father's parental rights was in the Children's best interest. We therefore affirm the termination of Father's parental rights in all respects.

## VI.  Conclusion

For the foregoing reasons, we affirm the trial court's judgment terminating Father's parental rights to the Children.  This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's parental rights to the Children and collection of costs assessed below.  Costs on appeal are assessed to the appellant, Mark D.


s/ Thomas R. Frierson, II_____
THOMAS R. FRIERSON, II, JUDGE